UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARK RUBIN and DEBORAH RUBIN,

Plaintiffs,

v.

KIRKLAND CHRYSLER-JEEP, INC.,

Defendant.

CASE NO. C05-0052C

ORDER

This case arises from an employment dispute in which a husband and wife claim to have been terminated in retaliation for their respective complaints about racial and sexual harassment. Defendant has moved for summary judgment (Dkt. No. 53) on (1) Plaintiff Mark Rubin's hostile work environment claim under 42 U.S.C. § 1981, 42 U.S.C. § 2000e-2(a), and RCW § 49.60.180; (2) both Plaintiffs' claims for retaliatory termination under § 1981, §§ 2000e-2(a) and (m), and RCW § 49.60.210(1); and (3) Mark Rubin's claim for wrongful termination in violation of public policy under Washington common law.

Having carefully considered the pleadings, memoranda, declarations, and exhibits on record and having determined that oral argument is unnecessary, the Court will GRANT IN PART and DENY IN PART Defendant's motion for the following reasons.

ORDER – 1

## I. APPLICABLE STANDARDS

### A. Summary Judgment Under Civil Rule 56(c)

Under Federal Rule of Civil Procedure 56(c), the Court must enter summary judgment if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of material fact exists, the Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). Accordingly, the Court may not "make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

In this employment-discrimination dispute, Plaintiffs must "produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record."[1] *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1125 (9th Cir. 2000) (internal quotes omitted). Indeed, the Ninth Circuit has "emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

### B. Evidentiary Disputes on Summary Judgment

Each side has presented arguments regarding the admissibility of the evidence relied upon by their opponent. It is axiomatic that the non-movant may not rely on inadmissible evidence in establishing that a genuine issue exists for trial. *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1003 (9th Cir. 2002). However, courts will not disregard evidence presented in inadmissible form on summary judgment if that evidence could be presented at trial in an admissible form. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*,

---

[1] The summary judgment analysis for discrimination claims under Washington law and federal law is the same. *See Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 925 n.1 (9th Cir. 2003).

ORDER – 2

374 F.3d 840, 846 (9th Cir. 2004). Accordingly, the Court will not rule on any evidentiary objections in this Order, but will take all evidence submitted only for admissible purposes.

## II.  ANALYSIS OF PLAINTIFFS' DISCRIMINATION CLAIMS

Plaintiffs' discrimination claims each arise in part under federal law and thus are analyzed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework.[2] In this case, Plaintiffs' initial burden on summary judgment is to make out a *prima facie* case of a hostile work environment or retaliatory termination, which "creates a rebuttable presumption that the employer unlawfully discriminated." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005). The burden then shifts to Defendant "to articulate some legitimate, nondiscriminatory reason" for the complained-of conduct. *McDonnell*, 411 U.S. at 802. In turn, Plaintiff must respond with "sufficient evidence to raise a genuine issue of material fact as to whether [Defendant's] proffered nondiscriminatory reason is merely a pretext for discrimination." *Dominguez-Curry*, 424 F.3d at 1037.

### A.  Mark Rubin's Hostile Work Environment Claim

#### 1.  *Plaintiff's* prima facie *case*

"To establish the *prima facie* hostile work environment claim under either Title VII or § 1981, [Plaintiff] must raise a triable issue of fact as to whether (1) [he] was subjected to verbal or physical conduct because of [his] race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (internal quotes omitted); *see also Wash. v. Boeing Co.*, 19 P.3d 1041, 1048 (Wash. Ct. App. 2000) (similar standard applies under Washington law). In evaluating whether Plaintiff has met his burden, the Court will consider the totality of the evidence, including "the frequency of the discriminatory conduct; its severity; whether it is physically

---

[2] The *McDonnell Douglas* framework applies to Plaintiffs' federal and state claims alike. *See E.E.O.C. v. Inland Marine Indus.*, 729 F.2d 1229, 1233 n.7 (9th Cir. 1984); *Estevez v. Faculty Club of Univ. of Wash.*, 120 P.3d 579, 587 (Wash. Ct. App. 2005).

ORDER – 3

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

When viewed in Plaintiffs' favor, the evidence supports Mark Rubin's *prima facie* claim for a hostile work environment. When he was hired as a Finance and Insurance ("F&I") Manager at Kirkland Chrysler-Jeep (the "Dealership") in February 2003, his job duties included "producing additional revenues for the dealership by selling finance contracts [and] insurance programs" to customers and "insur[ing] that his paperwork is done correctly." (Rubin Decl. ¶ 3; *id.* Att. A at 2.) He alleges that certain employees and managers made derogatory comments based on his Jewish ethnicity[3] over the approximately six months that he was employed by the Dealership, and that he immediately complained to General Sales Manager Sevynn Leverette after each of the episodes. (Bridges Decl. Ex. 1 at 10–11.)

In the first alleged incident, then-Floor Manager James Womack asked whether Rubin was allowed to eat a pork sandwich, and thereafter would often ask Rubin whether he had brought lox and bagels for lunch. (*Id.* at 4–5, 9; Rubin Decl. ¶¶ 6–7.) When Rubin later indicated during a sales meeting that he would "like to earn some extra money," Womack responded "with a last name like Rubin it doesn't surprise me." (Bridges Decl. Ex. 1 at 6.)

Rubin also alleges that on numerous occasions, Finance Director Julian Walters told Rubin "don't be a cheap Jew" and that Rubin "should stop worrying about the money, stop being so Jewish." (*Id.* at 9; Rubin Decl. ¶ 10.) During a subsequent discussion about whether the dealership should have a "Hanukkah sale," Walters allegedly stated that "there wouldn't be any profit in it, if you know what I mean." (Rubin Decl. ¶ 13.)

Rubin alleges that General Sales Manager Sevynn Leverette also made derogatory comments, including asking Rubin and fellow F&I Manager Joshua Skarloff "what Jew was responsible for the

---

[3] Ethnic Jews are a "race" within the ambit of federal anti-discrimination statutes. *Cf. Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) (recognizing Jewish ethnicity as basis for § 1982 suit).

ORDER – 4

founding of Islam" during a trivia contest.  (*Id.* ¶ 11.)  Rubin also claims that Leverette called him the "lease rabbi" on multiple occasions in front of clients and co-employees.[4]  (*Id.* ¶ 12.)

Although Rubin insists that he complained to Leverette after each of these incidents,[5] he admits that he did not alert upper management despite Leverette's indifference.  He claims that he "previously brought a concern about an unrelated matter to upper-level management and [Sevynn] Leverette warned me never to go over his head again."  (*Id.*)  It was not until Walters made derogatory comments to Mark's wife Deborah that he complained directly to upper management: On September 2, Rubin met with Dealership co-owners Blair and Brian McIntosh, Secretary-Treasurer Ann Plonski, and General Manager Darrell Rongholt.  Rubin began crying at the start of the meeting and described Walters's comments to himself and Deborah; he later submitted a written statement to management describing additional allegations against Walters.  (*Id.* Att. D.)  Rubin alleges that he also disclosed during the meeting the comments by Leverette, Womack, and Rivera.  (*Id.* ¶ 21.)  The Court finds that the evidence supports Rubin's allegation that he was subjected to unwelcome verbal conduct because of his race.[6]

The third element of the *prima facie* case encompasses a totality of the circumstances test, in which the Court must determine (1) whether the work environment was both objectively *and* subjectively hostile based on the severity or pervasiveness of the offensive conduct, and (2) whether such conduct by co-employees should be imputed to the employer.  *McGinest*, 360 F.3d at 1113; *Brooks v. City of San Mateo*, 229 F.3d 917, 923–24 (9th Cir. 2000).

---

[4] Rubin testified that he did not complain about a separate anti-Semitic comment by co-employee Sharon Rivera because she "was the mother of [Sevynn] Leverette's girlfriend" and he "feared Mr. Leverette's reaction to a complaint about Ms. Rivera." (Rubin Decl. ¶ 14.)

[5] Neither Sevynn Leverette nor Julian Walters has been deposed or submitted declarations.

[6] As noted above, the Court takes Plaintiff's allegations only for admissible evidentiary purposes. "The insults and taunting that the plaintiff recounts do not create hearsay problems; those statements are not offered for their truth, but, rather, to show that the words were spoken (and, thus, contributed to the hostile work environment)." *Noviello v. City of Boston*, 398 F.3d 76, 84–85 (1st Cir. 2005).

ORDER – 5

1    First, by any objective standard, the nature and number of alleged comments exceeded "[s]imple
2    teasing, offhand comments, and isolated incidents." *Manatt*, 339 F.3d at 798. Only three employees at
3    the Dealership were responsible for the discriminatory comments, but all three were in management
4    positions above Mark Rubin. On this record, the Court finds that a reasonable employee in Mark Rubin's
5    circumstances would find such an environment hostile enough to "seriously affect [his] emotional or
6    psychological well being." *Glasgow v. Georgia-Pac. Corp.*, 693 P.2d 708, 712 (Wash. 1985) (*en banc*).
7    The Court further finds that Rubin has established subjective hostility through his testimony that he
8    consistently voiced complaints to the Dealership's General Sales Manager and later to the EEOC.[7] *See*
9    *McGinest*, 360 F.3d at 1113 ("Subjective hostility is clearly established in the instant case through
10   [plaintiff's] unrebutted testimony and his complaints to supervisors and to the EEOC."). Rubin's and his
11   wife's statements as to the emotional and psychological impact of the work environment also support a
12   finding of subjective hostility. (*See* Rubin Decl. ¶ 15; Subit Decl. Ex. 5 at 98.)

13   Rubin has also shown that Defendant may be held liable "for failing to remedy or prevent a hostile
14   or offensive work environment of which management-level employees knew, or in the exercise of
15   reasonable care should have known." *Ellison v. Brady*, 924 F.2d 872, 881 (9th Cir. 1991) (internal
16   quotes omitted). The Court must credit Rubin's unrebutted testimony that he reported all alleged
17   incidents to General Sales Manager Sevynn Leverette, who certainly had supervisory authority sufficient
18   to impose liability under Title VII. *See Brooks*, 229 F.3d at 925 n.6 (defining "manager" "for Title VII
19   purposes [as] only those who have authority to hire, fire, or discipline employees, or recommend such
20   action").

21   In sum, Mark Rubin has established a *prima facie* case of hostile work environment by showing
22   that he was subjected to unwelcome verbal or physical conduct because of his race that was sufficiently
23   pervasive to alter the conditions of his employment and create an abusive work environment.

---

25   [7] The Rubins filed complaints with the EEOC in April 2004. (*See* Dkt. No. 47 at 2.)
26   ORDER – 6

### 2. *Defendant's rebuttal*

Defendant has responded by attempting to show that Rubin's testimony is untrustworthy, and thus that the complained-of comments simply did not occur. This is consistent with how some courts of appeal have applied the *McDonnell Douglas* framework to hostile work environment claims. *See, e.g.*, *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 898 (1st Cir. 1988) (defendant's burden is to "show that the events did not take place or that they were isolated or genuinely trivial") (citing *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983)).

Defendant's attack on Rubin's credibility relies primarily on upper management's statements that they found Rubin's allegations to be insincere and unsubstantiated. For example, Blair McIntosh testified that he had a "gut feeling" that Rubin's crying during their meeting "just sort of seemed fake." (Bridges Reply Decl. Ex. 5 at 21.) Plonski also found Rubin's emotional display "insincere." (Subit Decl. Ex. 6 at 127.) McIntosh further testified that he believed Rubin "might have had other motives other than with presenting the harassment claim." (Bridges Reply Decl. Ex. 5 at 22.) Brian McIntosh concurred, testifying that he did not believe any of the allegations raised by Mark Rubin. (Subit Decl. Ex. 7 at 143.) Defendant also argues that Rubin's allegations grew increasingly numerous and detailed over time, citing a memorandum prepared by Plonski that purports to summarize the September 2 meeting and states that Rubin complained *only* about Walters's comments to himself and Deborah. (McIntosh Decl. Ex. 9.)

Similarly, Defendant presents evidence that Rubin's co-employees did not corroborate his allegations. Blair McIntosh stated that he "spoke to others in the sales department" after meeting with Rubin, and that nobody "confirmed any of the allegations." (McIntosh Decl. ¶ 30.) He also claims to have spoken to Womack, who "adamantly denied" making any offensive comments to Rubin. (*Id.* ¶ 34.) Rubin's fellow F&I Manager, Joshua Skarloff (who also is Jewish) prepared a statement that the he had "never felt harassed because of [his] religion" nor heard "any insensitive comments made in any meetings" nor ever "made to feel uncomfortable." (*Id.* Ex. 7.)

ORDER – 7

This evidence creates a substantial dispute over the veracity of Mark Rubin's testimony, but this only illustrates the difficulties of resolving employment-discrimination cases on summary judgment. Because Defendant's response to Rubin's *prima facie* case boils down to a swearing contest between opposing witnesses, the Court cannot grant summary judgment without improperly weighing the credibility of potential trial witnesses. *See Lipsett*, 864 F.2d at 904; *see also McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 923 (10th Cir. 2001) ("[T]he severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact.").

In sum, the Court concludes that Defendant has failed to rebut Mark Rubin's *prima facie* claim of hostile work environment, and that Rubin has produced sufficient evidence to create triable issues of fact. The Court therefore DENIES Defendant's motion for summary judgment on Mark Rubin's hostile work environment claim.

### B. Mark Rubin's Retaliation Claim

#### 1. *Plaintiff's* prima facie *case*

The *McDonnell Douglas* framework also applies to Mark Rubin's retaliation claim, for which he must show that (1) he engaged in "activity intended to oppose an employer's discriminatory practices"; (2) he suffered an adverse employment action; and (3) there was a causal link between his protected activity and the adverse employment decision. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1196–97 (9th Cir. 2003); *accord Milligan v. Thompson*, 42 P.3d 418, 424 (Wash. Ct. App. 2002). The evidence in this case establishes the first two elements with little difficulty. Mark Rubin clearly engaged in protected activity by submitting oral and written complaints, and his termination certainly constitutes an adverse employment action. *See Estevez v. Faculty Club of Univ. of Wash.*, 120 P.3d 579, 590 (Wash. Ct. App. 2005); *Brooks*, 229 F.3d at 928.

As to the third element, it is well established that direct evidence is not required to show a causal relationship between an employee's protected activity and the adverse employment action: "Because employers rarely will reveal [that] they are motivated by retaliation, plaintiffs ordinarily must resort to

ORDER – 8

circumstantial evidence to demonstrate retaliatory purpose." *Estevez*, 120 P.3d at 590. Accordingly, Rubin relies on an inference of retaliation arising from his termination on September 10, 2003, scarcely a week after his meeting with upper management. (Rubin Decl. Att. F.) Such an inference is permissible on summary judgment: "That an employer's actions were caused by an employee's engagement in protected activities may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision." *Raad*, 323 F.3d at 1196–97; *see also Estevez*, 120 P.3d at 590 (noting that when plaintiff "establishes that he or she participated in an opposition activity, and he or she was discharged, then a rebuttable presumption is created in favor of the employee").

The Court finds that Rubin has met his *prima facie* burden of establishing "that a protected characteristic played a motivating factor" in his termination. *Dominguez-Curry*, 424 F.3d at 1042.

### 2. *Defendant's rebuttal*

Defendant's rebuttal burden is "to articulate some legitimate, nondiscriminatory reason" for Mark Rubin's termination. *McDonnell*, 411 U.S. at 802. Defendant's first proffered nondiscriminatory reason is Rubin's allegedly poor work performance. Defendant cites a disciplinary write up issued to Rubin in April 2003, which stated that he displayed a "lack of organization and professionalism" and "ineffective handling of deals and paperwork." (Rubin Decl. Att. B.) The write-up added that Rubin was expected to "improve [his] organization skills" as well as "the processing of deals prior to funding." (*Id.*) Defendant alleges that when Rubin's performance issues continued, Finance Director Julian Walters was hired to supervise the F&I Managers and correct Rubin's inattentiveness to detail. (Subit Decl. Ex. 1 at 22.) Rubin's fellow F&I Manager Joshua Skarloff and Treasurer Ann Plonski testified that they too had noticed Rubin's sloppy work. (Bridges Reply Decl. Ex. 6 at 30–33; *id.* Ex. 8 at 37.) Defendant also points to Rubin's alleged demotion to a "Sales Desk Manager" position in early August (McIntosh Decl. ¶¶ 47–48), as well as his second disciplinary write-up on September 9 for unspecified "actions having a negative effect on the moral[e] of the team" (Rubin Decl. Att. E).

ORDER – 9

In addition to Rubin's alleged performance problems, Defendants assert that Rubin was simply laid off during as sales department "restructuring" following General Sales Manager Sevynn Leverette's resignation. McIntosh states that he viewed Leverette's September 4 resignation as an opportunity to "reorganize the department" and eliminate what he viewed as "unneeded" employees hired by Leverette. (McIntosh Decl. ¶ 7.) After McIntosh replaced Leverette with Lin Loya as General Sales Manager, he began a slate of eight layoffs, including Mark Rubin's on September 10. (*Id.* ¶ 53.) McIntosh testified that he determined which positions or employees would be laid off based on "what positions [he] wanted to keep, how many managers [he] wanted to have, and really based on experience too." (Subit Decl. Ex. 1 at 35.) He further testified that he made a single, collective decision to terminate each of the affected individuals, although the actual terminations stretched over more than six weeks. (*Id.* at 36–37.) As to Mark Rubin specifically, McIntosh asserted that his termination was motivated solely by Rubin's performance problems and lack of managerial experience, and that Rubin's complaints carried "absolutely no weight." (McIntosh Decl. ¶ 60.) On the whole, this evidence supports Defendant's proffered nondiscriminatory reason for Mark Rubin's termination.

### 3. *Plaintiff's evidence of pretext*

With Defendant having met its burden, Mark Rubin must respond by producing "sufficient evidence to raise a genuine issue of material fact as to whether [Defendant's] proffered nondiscriminatory reason is merely a pretext for discrimination." *Dominguez-Curry*, 424 F.3d at 1037. Rubin may show pretext either directly, "by showing that unlawful discrimination more likely motivated the employer," or indirectly, "by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Id.*

The Court finds that Rubin has met this burden by demonstrating pretext both directly and indirectly. First, Rubin presented sufficient evidence that alleged performance problems were not the more likely explanation for his termination. Despite General Sales Manager Sevynn Leverette's

ORDER – 10

reputation for harshness and a willingness to issue disciplinary write-ups frequently,[8] Rubin received only one write-up during Leverette's tenure as general sales manager. If Rubin's performance were as consistently poor as Defendant alleges, especially given the importance of Rubin's position in F&I, it is unlikely that Rubin would have escaped with only a single write up under a manager that Defendant admits was terminated in part for making threats to his subordinates. (*See* McIntosh Decl. Ex. 8.) Moreover, the evidence suggests that Rubin's transfer to the Sales Desk by Leverette was likely a promotion, which further undercuts Defendant's performance criticisms. (*See* Subit Decl. Ex. 7 at 140; Rubin Decl. Att. C.)

Rubin has also presented sufficient evidence to establish a genuine factual issue as to the motivation for his second disciplinary write-up, which contains only a vague reference to "actions having a negative effect on the moral[e] of the team" and was issued one week after Rubin's discrimination complaint and one day before his termination. (Rubin Decl. Att. E.) *Cf. Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001) ("[U]nwarranted reduction in performance review scores can constitute evidence of pretext in retaliation cases."). Of even greater import is Rubin's contested allegation that General Sales Manager Lin Loya told him privately that the disciplinary action was related to Rubin's discrimination complaints, and that Rubin would be terminated as a result. (Rubin Decl. ¶ 23; Bridges Reply Decl. Ex. 10 at 53.)

In sum, although Defendant rebutted Mark Rubin's *prima facie* claim of retaliatory termination, Rubin has produced sufficient evidence to create triable issues of fact as to whether Defendant's proffered nondiscriminatory explanations are pretextual. The Court therefore DENIES Defendant's motion for summary judgment on Mark Rubin's claim of retaliatory termination.

---

[8] Floor Manager James Womack testified that he received four or five disciplinary write-ups from Leverette between May and August for missing department meetings while his wife underwent cancer treatments. (Bridges Reply Decl. Ex. 9 at 44–45; Subit Decl. Ex. 8 at 153–57.)

ORDER – 11

C.     **Deborah Rubin's Retaliation Claim**

    *1.*     *Plaintiff's* prima facie *case*

Like her husband, Deborah Rubin must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between her protected activity and the adverse employment decision. She clearly engaged in protected activity by submitting a written complaint describing derogatory comments allegedly made by Finance Manager Julian Walters. And there is no dispute that Deborah Rubin suffered an adverse employment action when her position was terminated in September 2003, only one month after she was hired. As with her husband's claim, the pivotal question is whether there was any causal connection between those two events. To establish such a nexus, Deborah Rubin alleges the following:

In August 2003, General Sales Manager Sevynn Leverette created two positions titled "Delivery Coordinator" to provide customers who had purchased a car a walk-through of the owner's manual, among other minor tasks. (Bridges Decl. Ex. 2 at 19–27.) At Mark Rubin's suggestion, Leverette hired Deborah Rubin for one of the coordinator positions on or about August 15, 2003. (Subit Decl. Ex.5 at 90–91.) The other position had been filled some five months previously by Sharon Rivera, a former sales person and the mother of Leverette's then-girlfriend. (*Id.* Ex. 1 at 23–24.)

When Deborah brought her daughter to work shortly after starting, she disclosed in response to some co-workers' questions that the child's father is African-American. (Bridges Decl. Ex. 2 at 26–27.) Soon thereafter, Walters allegedly asked Deborah whether she "used to date brothers." (*Id.* at 29.) When she responded that she had, Walters allegedly stated that she "must be the only white wom[a]n in history to ever go back to white men after dating brothers." (*Id.* at 30.)

Deborah immediately called her husband at home to relay Walters's comments. (*Id.* at 35.) She later testified that she found Walters's comment "racially offensive" due to the suggestion that one race is inherently more proficient sexually than another, and also because the comment was directed to her "as a woman" and was derogatory to her husband. (*Id.* at 31, 34.) Deborah did not report Walters's

ORDER – 12

comments to any management personnel at the dealership that day "because [she] didn't know how to handle it" or "what the recourse would [be]." (*Id.*)

Instead, Mark Rubin incorporated her complaint into his own when he met with management collectively on September 2, 2003. (Bridges Reply Decl. Ex. 5 at 66.) Deborah later wrote out her own complaint at management's request and met with them to discuss her allegations. (Rubin Decl. Att. D; Bridges Decl. Ex. 2 at 35.) She was told during the meeting that Walters's comments were "unfortunate" and received an apology for what she had been through. (Subit Decl. Ex. 5 at 64–65.) Nonetheless, eight days after her husband was terminated, Deborah was informed that she would be laid off because the "Delivery Coordinator" position was being eliminated. (McIntosh Decl. Ex. 2.)

Against this evidentiary backdrop, the parties argue whether Deborah may legally assert a claim that she was retaliated against for her husband's complaints as well as her own. The case law appears conflicted as to whether a spouse has standing to assert a Title VII claim for retaliation based on her spouse's anti-discrimination conduct. *Compare Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1227 (5th Cir. 1996) (holding that spouse who had not participated in protected conduct "does not have automatic standing to sue for retaliation . . . simply because his spouse has engaged in protected activity") *with Gonzalez v. N.Y. State Dep't of Corr.*, 122 F. Supp. 2d 335, 347 (N.D.N.Y. 2000) ("[P]rohibiting the retaliated against spouse from maintaining an action would provide a means for an employer to circumvent Title VII's remedial scheme.").

However, the Court need not reach a legal conclusion as to Deborah Rubin's standing because she has presented no evidence suggesting that her termination resulted from her husband's complaints. Although Mark Rubin did incorporate his wife's complaint into his own, Deborah later submitted a much more detailed written complaint and met on her own with management to discuss her allegations. Mark Rubin's speculation that he would have "made sure that [Deborah] continued to be employed" (Rubin Decl. ¶ 25) had he not been terminated does not demonstrate a nexus between *his* protected activities and *her* termination.

ORDER – 13

1    Accordingly, the Court finds that Deborah Rubin has established a *prima facie* case of retaliatory

2 termination based solely on her own complaint about Julian Walters's comments to her.

3    2.    *Defendant's rebuttal*

4    On rebuttal, Defendant asserts that its nondiscriminatory reason for terminating Deborah Rubin

5 was her short tenure in what management viewed as an unnecessary position.  Blair McIntosh stated that

6 he had always had reservations about the need for a Delivery Coordinator position, as those tasks "could

7 easily be done and were traditionally done by the sales consultants." (McIntosh Decl. ¶ 12.)  He

8 described the job as "totally unnecessary" and asserted that "[i]n terms of trimming costs it was perhaps

9 the easiest decision" during the restructuring.  (*Id.* ¶¶ 5, 8.)  McIntosh eliminated the Delivery

10 Coordinator positions within a day of each other, and both Deborah Rubin and Sharon Rivera were

11 terminated rather than reassigned within the Dealership.  (*Id.* ¶ 8; Subit Decl. Ex. 1 at 40–41.)

12    Defendant has also presented evidence showing that management took immediate remedial action

13 when presented with Deborah's allegations against Walters.  Rongholt testified that before they met with

14 Deborah Rubin, he and Blair McIntosh called Walters into Rongholt's office to discuss the Rubins'

15 complaints.  (Subit Decl. Ex. 3 at 68.)  Walters admitted to making the "brothers" statement to Deborah

16 Rubin, and prepared a written statement that although he could not recall the exact comments about

17 which Deborah Rubin complained, he "could have been joking" and apologized for any harm done.  (*Id.*)

18 Rongholt also testified that he subsequently interviewed three or four other employees to investigate

19 Deborah Rubin's complaint.  (*Id.* at 70.)

20    On September 8, Walters and Rongholt signed a "Personnel Action Form" indicating that Walters

21 had resigned.  (*Id.* at 84.)  Blair McIntosh also stated in a declaration that during the meeting with

22 Walters, McIntosh "determined that [he] was going to fire Mr. Walters," but Walters submitted his

23 resignation before McIntosh had time to act.  (McIntosh Decl. ¶ 22; *see also* Bridges Reply Decl. Ex. 5

24 at 25.)  Rongholt testified that terminating Walters was an issue that he and McIntosh had discussed, but

25 that Walters had not been asked to resign.  (Subit Decl. Ex. 3 at 73–74.)

26 ORDER – 14

These allegations, even when viewed in the light most favorable to Deborah Rubin, support Defendant's assertion that her termination was motivated solely by management's nondiscriminatory purpose of eliminating unnecessary sales positions created by a former manager.

### 3. Plaintiff's evidence of pretext

The burden thus shifts back to Deborah to show pretext either directly, "by showing that unlawful discrimination more likely motivated the employer," or indirectly, "by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez-Curry*, 424 F.3d at 1037. Because Deborah relies solely on circumstantial evidence, "such evidence has to be specific and substantial." *Winarto*, 274 F.3d at 1284.

The Court finds that Deborah Rubin has failed to meet her burden. There is no dispute that both Delivery Coordinator positions were eliminated and both employees terminated as part of the restructuring after Leverette's resignation. And unlike her husband, Deborah Rubin has produced no evidence of pretextual disciplinary write-ups, admissions by a manager that her complaint prompted her termination, or evidence that similarly situated co-employees were treated differently. Instead, she relies on the proximity between her complaint on September 2 and her termination on September 18. While this temporal proximity is sufficient to establish an initial presumption of discrimination, it is insufficiently specific or substantial to rebut Defendant's proffered nondiscriminatory reasons.

Moreover, it is undisputed that the Dealership's management responded promptly to Deborah's complaint by taking her written statement and meeting with her in person, and then interviewing Julian Walters. Management apologized for her ordeal, accepted her allegations, and then confirmed them through its own investigation. And regardless of whether Walters's termination was imminent, the record certainly reflects that his resignation was in partial response to Deborah's allegations. These actions do not support an inference that the Dealership's nondiscriminatory explanation is "inconsistent or otherwise not believable" or that unlawful discrimination more likely motivated the Dealership. *Dominguez-Curry*, 424 F.3d at 1037.

ORDER – 15

For these reasons, the Court concludes that Defendant has proffered a legitimate, nondiscriminatory reason for Deborah Rubin's termination and that the evidence does not support an inference that Defendant's proffered reason was even partially pretextual. The Court therefore GRANTS Defendant's motion for summary judgment on Deborah Rubin's retaliation claim.

### III. ANALYSIS OF MARK RUBIN'S WRONGFUL TERMINATION CLAIM

Under Washington law, a plaintiff establishes a *prima facie* case of wrongful termination by showing (1) the existence of a clear mandate of public policy, (2) that discouraging his conduct would jeopardize the public policy, and (3) that his conduct was linked to his dismissal. *Sedlacek v. Hillis*, 36 P.3d 1014, 1018 (Wash. 2001). In response, the employer must be unable to offer an overriding justification for the dismissal. *Id.*

To support his claim, Mark Rubin alleges that he witnessed Julian Walters repeatedly forging "contracts [and] state documents" and was "told to shut up and not discuss [the forgeries] with anyone" after he complained. (Rubin Decl. Att. D.) These allegations were included in Rubin's written statement following his initial meeting with management on September 2. (*Id.*) He later specified in his deposition that he had seen Walters forge customer signatures on loan documents, odometer disclosures, as-is stickers, lemon-law disclosures, purchase orders, and licensing documents, and asserted that upper management knew of this practice and its attendant risks. (Subit Decl. Ex. 11 at 165.)

These allegations establish Rubin's *prima facie* case. First, "[w]hether or not a clear mandate of public policy exists . . . is a question of law. . . This court has found Washington statutes and case law to be primary sources of Washington public policy." *Sedlacek*, 36 P.3d at 1018. State and federal statutory law demonstrates a clear mandate of public policy against the type of conduct Rubin claims to have observed. Specifically, Washington law requires the customer's signature on odometer disclosures and that dealerships ensure that the customer understands his rights under the state's "lemon laws." *See* WASH. REV. CODE §§ 46.12.124(f), 19.118.005. Federal law further requires that consumers be truthfully informed of the terms of all loan transactions. *See* 15 U.S.C. § 1601(a); 12 C.F.R. § 226.1(b).

ORDER – 16

Second, Rubin's allegations, when viewed in the light most favorable to him, establish that he complained about conduct that would likely violate the public policies against forging customer signatures on loan and disclosure statements. Accepting for purposes of summary judgment Rubin's testimony that he witnessed unlawful conduct and brought it to management's attention, the Court finds that allowing an employer to discourage such actions would jeopardize these public policies. *See Smith v. Bates Tech. College*, 991 P.2d 1135, 1140 (Wash. 2000) (citing *Harless v. First Nat'l Bank*, 246 S.E.2d 270 (W. Va.1978)).

Third, Rubin has established a *prima facie* showing that his termination was linked to his complaint. It suffices to defeat summary judgment to show that a plaintiff reported potential misconduct and was fired shortly thereafter. *See Shaw v. Hous. Auth. of City of Walla Walla*, 880 P.2d 1006, 1009–10 (Wash. Ct. App. 1994). The close proximity between Rubin's complaint of misconduct and his termination, in addition to the unexplained disciplinary write-up only one day before his termination, supports his allegations. *See Boring v. Alaska Airlines, Inc.*, 97 P.3d 51, 54 (Wash. Ct. App. 2004).

In response, Defendant argues that the lack of specificity in Rubin's initial written complaint and his failure to mention Walters's alleged forgeries during their initial September 2 meeting casts doubt on Rubin's credibility. Blair McIntosh asserts that he asked Plonski to audit the sales files to investigate the forgery charges, and that Plonski "looked for items such as mismatched handwriting, crossed out signatures, or changed terms of deals" but found nothing out of the ordinary. (McIntosh Decl. ¶¶ 37–38.) These allegations may create a credibility contest between Rubin and the Dealership's management, but "[t]he reasonableness of the manner in which [Plaintiff] reported the alleged misconduct and the degree of [Defendant's] alleged wrongdoing are questions for the trier of fact." *Shaw*, 880 P.2d at 1010.

For these reasons, the Court finds that Defendant has not rebutted Mark Rubin's *prima facie* case of wrongful termination in violation of public policy, and therefore DENIES Defendant's motion for summary judgment on that claim.

ORDER – 17

## IV. DEFENDANT'S REQUEST FOR LEAVE TO FILE OVERLENGTH BRIEF

The Court's January 10 minute order provided, per Local Rule CR 7(f)(4), that Defendant's reply brief was not to exceed fourteen pages. (Dkt. No. 59.) Nonetheless, Defendant requests via a footnote in its reply brief for leave to file a twenty-three-page reply. (Reply 1 fn. 1.) Motions for leave to file overlength briefs are disfavored, especially when the movant disregards the rule requiring such motions to be filed "at least three judicial days before the underlying motion or brief is due." CR 7(f)(1). The Court also finds it difficult to believe that Defendant could not have pared its reply brief down to the required page limit. *Cf. Malec v. Sanford*, 191 F.R.D. 581, 586 (N.D. Ill. 2000) (extolling the virtues of "rigorously editing one's work (*i.e.*, deleting repetitious matter, useless verbiage, and material that presents nothing more than counsel's indignance)").

Defendant's request for leave is DENIED. The Court will disregard the material after page fourteen of Defendant's reply brief.

## V. CONCLUSION AND ORDER

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment IN PART, and ORDERS that Deborah Rubin's claim for retaliatory termination be DISMISSED with prejudice.

Defendant's summary judgment motion is DENIED in all other respects, as is its request for leave to file an overlength reply brief.

SO ORDERED this 13th day of April, 2006.

*[signature]*

UNITED STATES DISTRICT JUDGE

ORDER – 18